841 A.2d 893

**STATE of Maryland**

v.

**Tigra D. AKOPIAN.**

**No. 2488, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Feb. 5, 2004.

Mary Ann Ince (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Gary H. Gerstenfield (Rebecca E. Cosca, Jonathan S. Shurberg, on the brief), Silver Spring, for appellee.

Panel: MURPHY, C.J., ADKINS, SHARER, JJ.

SHARER, Judge.

The Circuit Court for Montgomery County, after ruling that the State entered a *nolle prosequi* of the charges against appellee, Tigra D. Akopian, to circumvent the denial of a continuance by the administrative judge, dismissed the charges following a re-indictment. The State has appealed the dismissal.

The State raises one question for review,[1] which we have rephrased for clarity:

Did the State's entry of a *nolle prosequi* of the charges against appellee have the effect, either actual or intentional, of circumventing Rule 4–271 [2], requiring appellee to be tried within 180 days?

We answer the question in the negative, and therefore reverse.

## PROCEDURAL HISTORY

By indictment of the grand jury, returned on June 13, 2002, appellee, Tigra D. Akopian,[3] was charged with robbery and conspiracy to commit robbery. A privately retained attorney entered his appearance on behalf of appellee on June 20, 2002, thus starting the *Hicks* calendar, which would have required

---

**1.** The question as originally presented by the State for review is:

Did the trial court err in dismissing the charges against [appellee] after re-indictment, where the State nol prossed the original charges because the State could not proceed to trial due to the unavailability of witnesses?

**2.** Maryland Rule 4–271(a)(1) (2003) provides in pertinent part:

The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events.

This rule is commonly called "the *Hicks* Rule" (hereinafter "*Hicks*") referring to *State v. Hicks*, 285 Md. 310, 403 A.2d 356, *on motion for reconsideration*, originally 285 Md. at 334, 403 A.2d 356 (1979).

**3.** Appellee's first name is alternately spelled "Tigran" in some of the trial court documents. We utilize the spelling from appellee's brief.

that appellee be tried not later than December 17, 2002.[4] Trial was set for September 11, 2002.

On September 6, 2002, the State moved to continue because a police officer, considered "an essential State's witness," was not available on the scheduled trial date.[5] The motion was granted and a new trial date was set for October 22, 2002. The case was called for trial on that date and the State again requested a continuance. The request was referred to the administrative judge. In support of its motion, the State noted appellee's motion for appropriate relief filed the previous day, and the unavailability of one of the State's witnesses. When requesting the postponement, the State argued:

> [PROSECUTOR]: Your Honor, this matter was set for trial this morning, and the State is not—well, let me just back up for one moment and offer to the Court that [appellee's counsel] filed a motion for appropriate relief yesterday—I just received it yesterday—asking the court to order a pretrial identification of his client, and—
>
> \* \* \*
>
> ... And on top of that, I also have witnesses today—two officers, specifically the K–9 officer in this case—this is a track case—who is not available—he's out with the shootings [6]—as well as the lead officer.

Based on all the circumstances, I would actually ask the Court to postpone this case and charge it to both the State and the defense.

---

4. The State and appellee seem to agree that the 180th day was December 12, 2002. Because the record does not reveal a first appearance by appellee earlier than June 20, 2002, we have calculated the last possible trial date to be December 17, 2002.

5. The docket entries incorrectly reflect that the continuance was granted at the request of appellee. It is clear, however, from the record, that the State requested the postponement of the September 11, 2002 trial date, and not appellee.

6. "The shootings" referred to a series of sniper attacks that occurred in Montgomery County, and nearby Virginia counties, during the month of October, 2002.

There was discussion on the record concerning which party had requested the earlier continuance, and the court determined that the State had made the request, not appellee as incorrectly indicated in the docket entries. The administrative judge denied the State's request for continuance. The State then asked the administrative judge to reconsider, or to postpone the trial until the next day if possible. When the administrative judge pointed out that appellee would have to remain in jail while the case was rescheduled, the State argued:

> [PROSECUTOR]: Well, Your Honor, and I would also ask the Court to consider this. I can ask for a brief postponement. I can try this case tomorrow.
>
> [THE COURT]: You got a continuance once before. Your predecessor got a continuance, because you weren't ready then.
>
> [PROSECUTOR]: Understood. I understood, (sic) Your Honor. But I can ask for a brief postponement of even a day. All I am asking for is for the officer to be able to come. This is a K–9 case.

* * *

> [THE COURT]: No. You can pick the jury. You can get started. Do whatever you need to today. And if you want to start the testimony, you can do it tomorrow morning.

Although the administrative judge technically denied the State's request for a one-day continuance he did, in effect, tell the State that a continuance was not actually needed in the circumstances because witnesses would not be reached until the next day. Thereafter, appellee maneuvered the State into an untenable position, *vis a vis* its witness.

The parties returned to the courtroom of the assigned trial judge. When the case was called for trial, appellee, by his counsel, told the court that he had no motions to make, waived his right to a jury trial, and elected to have a bench trial. The effect of those elections was to put the State to the task of proceeding immediately to trial, rather than to a motions

hearing and jury selection, as had been anticipated by the State and the administrative judge. The State renewed its motion for continuance, and in further support offered:

> [PROSECUTOR]: Your Honor, if I may just for the record, a critical witness in this case is a K–9 officer and he is out working the sniper case. He has not returned our pages. I am not able to reach him. Given the severity of the situation and his—
>
> [DEFENSE]: We have reached him. It is just that he cannot get off his case.
>
> [PROSECUTOR]: Oh, I am sorry, Your Honor. We have been able to contact him but he is out there with the dogs right now looking for the sniper and I am not ready to proceed. I will nolle-pros all counts at this time. I will be re-indicting this case on Thursday.

Defense counsel argued that the officer, whose unavailability was the basis for the State's motion, was not an essential witness and that, therefore, it was inappropriate for the State to base its postponement request on that officer's absence. Counsel noted appellee's speedy trial rights for the record, and further noted that the *Hicks* date was approaching. The court noted the objection, but acknowledged that "the prosecutor carries an (sic) near absolute power to nolle-pros (sic) those cases if it feels appropriate to do so."

Appellee was re-indicted on October 24, 2002.[7] An initial appearance was held on October 28, 2002, at which he was represented by the Office of the Public Defender.[8] The court scheduled a status conference for November 1, 2002. Appellee was incarcerated and not transported for the hearing. At that conference, before the administrative judge, the following ensued:

---

7. This indictment was under Case Number 96565, and charged the same offenses.

8. It was specified that appellee would be represented by the Office of the Public Defender at this hearing only.

[PROSECUTOR]: Your Honor, this is a re-indictment of a case I nol-prossed last week because one of my officers, the K–9 officer, was unavailable for trial because of the sniper shooting—the last sniper shooting. And I had asked for a postponement, it was denied, and I then nol-prossed the case and reindicted it Thursday.

\* \* \*

[PROSECUTOR]: If Your Honor can set in both a 4–215 and a trial date, I don't—Your Honor, I am in—I am—

[THE COURT]: I can't put the cart before the horse. What is the sense in me setting a trial date without getting a lawyer for—and I assume the Public Defender is going to have to interview him. By the time they get somebody assigned to this case, Lord knows when they will be ready for trial.

[PROSECUTOR]: *Well, Your Honor, I am in a difficult position, because I have a 180 problem that I am trying to avoid.*

\* \* \*

[THE COURT]: . . . I can't set a trial date until I get him a lawyer. It doesn't make any sense.

(Emphasis added).

Thereupon, the administrative judge recessed the status conference and ordered that it be reconvened, in conjunction with a Rule 4–215 hearing,[9] on November 7, 2002. The administrative judge also ordered that appellee be interviewed by the Office of the Public Defender. At the November 7, 2002 status conference and Rule 4–215 hearing, appellee was again unrepresented; the court questioned him regarding the status of his representation.

---

**9.** Maryland Rule 4–215 provides the requirements for waiver of counsel by a criminal defendant in both District Court and Circuit Court proceedings.

[THE COURT]: Is [your previous attorney] going to represent you?

[DEFENDANT]: I'm not sure yet, sir, because when I got found nol-prosecuted (sic) on my charge, I was under—he and I was under the impression that the case was basically over.

\* \* \*

[PROSECUTOR]: Your Honor, I understand that the continuance was denied on the day of trial when a K–9 officer was involved with searching the sniper's car, and [the State] made it clear on that date, I think on the record, that she planned to re-indict the case, and [Akopian's previous attorney] was certainly aware of that.

[THE COURT]: Have you contacted the Public Defender's Office?

[DEFENDANT]: No, sir. I plan on getting a paid lawyer for this case.

[THE COURT]: I know, but we need to get—you have a trial date coming up on January 13.

[DEFENDANT]: I plan on having a lawyer by then, sir.

[THE COURT]: Well, I am going to bring you back every week until you tell me who your lawyer is.

[DEFENDANT]: Okay, sir. I have to tell my family to hire me a lawyer, because right now—

[PROSECUTOR]: Your Honor, I believe the *Hicks* date on the original case runs on—

[THE COURT]: That wouldn't make any difference. It wouldn't—

[PROSECUTOR]:I don't think so either, but I guess [the State] was a little concerned.

[THE COURT]: Have you talked to Mr. [your previous attorney]?

[DEFENDANT]: No, sir.

[THE COURT]: Why?

[DEFENDANT]: I haven't—I haven't—

* * *

[THE COURT]: Has [he] been out to see you?

[DEFENDANT]: No, sir.

[THE COURT]: And you haven't called him?

[DEFENDANT]: No, sir.

[THE COURT]: I would suggest you get—when you get back to the jail today, you better get in touch with him—

[DEFENDANT]: Yes, sir.

[THE COURT]:—because if you don't, then I am going to have the Public Defender represent you.

[DEFENDANT]: Yes, sir.

Appellant's father then indicated to the court that he intended to hire an attorney for his son, and repeatedly refused the services of the Office of the Public Defender.[10]

---

**10.** The following colloquy then occurred on the record:

THE COURT: Are you his father?

[DEFENDANT'S FATHER]: Yeah, I am his father. And right now we're negotiating with several lawyers. It might not be [Akopian's previous attorney]. I'm not sure. But by the time of his court date he will have a lawyer. I guarantee that. He cannot talk—

THE COURT: I am continuing this for the 15th of November. That is about 10 days from now.

[DEFENDANT'S FATHER]: Yeah, but we have to come up with the money, you know.

THE COURT: I know.

* * *

THE COURT: I have got to have a lawyer in place to be prepared to go to trial in January.

[DEFENDANT'S FATHER]: But isn't it enough that he will be having a lawyer a week before the trial date? I guarantee that he will be (sic) a lawyer.

* * *

THE COURT: No, no, no.

[DEFENDANT'S FATHER]: Why not?

THE COURT: A lawyer—you can't get a lawyer a week before the trial date.

[DEFENDANT'S FATHER]: Not a week. I'm just saying that the week before he definitely will have—maybe—maybe two weeks before that, something like that.

THE COURT: Have you talked to any lawyers?

[DEFENDANT'S FATHER]: Yeah, I talked with several lawyers.

* * *

The State filed a motion to advance the trial date to November 8, 2002.[11] The State's motion addressed the speedy trial issue: "The Maryland Rule 4–213, 180 day requirement on the first case began on June 6, 2002. . . . The State seeks to advance the trial date of the instant matter, to a date before December 12, 2002 to foreclose any possible claim of a 180 day violation, pursuant to Rule 4–213." [12]

The administrative judge held yet another status conference for November 15, 2002. Appellee was present, but was again unrepresented. On this occasion, appellee's father again appeared and told the court that he had not yet hired a lawyer for his son, but that he was "in the process of hiring a lawyer." The State again raised the issue of the *Hicks* deadline to the court:

[PROSECUTOR]: . . . [t]his is not a new indictment. This is a re-indictment.

[THE COURT]: It doesn't make any difference.

---

THE COURT: Well, you have till the 15th of November.
[DEFENDANT'S FATHER]: But I might not be able to guarantee by that time that I will have a lawyer.
\* \* \*
THE COURT: You tell the lawyer who you spoke to that he has to enter—or she has to enter their appearance by the 15th, because he is going to be back here on the 15th.
[DEFENDANT'S FATHER]: Your Honor, but I have to come up with the money . . .
  Until you pay the money nobody will come.
THE COURT: That is why if he—if you don't have the money to hire somebody, I am going to have the Public Defender talk to him.
[DEFENDANT'S FATHER]: No. I will have money by that time. He will have a lawyer.
THE COURT: Well, we can't—
[DEFENDANT'S FATHER]: I guarantee that.
THE COURT: The problem is we can't wait till you get the money.

11. In its motion, the State addressed appellee's representation: "The State spoke with the Defendant's counsel . . . prior to the first status hearing on the re-indicted case in order to schedule an advanced trial date. [Defendant's counsel] appeared for the status hearing on November 1, 2002, but left prior to the matter being called, stating that he had not been retained for the instant matter."

12. We assume that the State intended to refer to Md. Rule 4–271.

[PROSECUTOR]: And I will offer the Court this information. When the case was nol-prossed, the Court denied my postponement request, and I was not able to go forward with trial, and I went ahead and nol-prossed the case and re-indicted it two days later.

And in the first case,[defendant's previous attorney], represented the defendant, and it is my understanding that he also has a case coming up next week.

* * *

But I will offer to the Court that when [he] realized that I was in—I was in a position to ask that this case be set within 180 counting from the case that was initially—the first indictment in this case, to ensure that there would not be a speedy trial violation or objection.

To remove that as a possible issue, I had spoken with [Akopian's previous attorney] about setting this case in before the 180 [days] expired.

* * *

[THE COURT]: Well, he doesn't have counsel. That is the problem.

[PROSECUTOR]: But I would ask the Court—you already advised him of his right to counsel . . . last week.

* * *

But in any event, if the Court would just set a trial date and—you have already advised him many, many times to get counsel.

If it is not going to be [Akopian's previous attorney], who I think at this point is—and with all due respect to him, I think that he is just really trying to delay this beyond my 180 day at this point and will not be coming into this case.

Having been advised and having had counsel in the previous matter, *I would just ask the Court to set this case in before the 180 expires.*

And I will just offer to the Court, I have argued this particular issue in front of Judge Mason, and he has advised me on this motion for a speedy trial on another case where a re-indictment occurred, and he said it is the State's obligation to ensure that there is an advanced trial date for that re-indictment.

And at this point I have done everything I could to get this thing set in.

(Emphasis added).

The administrative judge instructed appellee's father to contact his son's previous attorney between that date and the next week, and instruct him to appear. On November 22, 2002, appellee again appeared without counsel.

[PROSECUTOR]: Well, we need [appellee] because [Akopian's previous attorney] may or may not represent him, and at this point, I would ask the Court to just sign a waiver and *advance the trial date.*

[THE COURT]: I am not going to do that until he gets a lawyer.

\* \* \*

[PROSECUTOR]: Oh, [appellee] is not here. Okay, Your Honor. I just don't know what to do with him anymore, because this is the ongoing case—

[THE COURT]: Yeah, I know.

[PROSECUTOR]: Right.

[THE COURT]: But I am not going to get into any waivers or anything else until he gets counsel.

[PROSECUTOR]: Right. But if he chooses not to get counsel, which seems to be the case, given that this is the third week in a row that we have been here trying to find out whether or not he has a public defender or [his previous attorney].

He was here last week with his father, who spoke at length about his questions for [his son's previous attorney],

and I think Your Honor was going to contact [that attorney]. I haven't heard from him.

[The COURT]: I did, and [he] has not entered his appearance yet.

[PROSECUTOR]: Right. And since we can't make him do that, at this point I am not certain where to go with this case. If Your Honor would—well, maybe you would find a good-cause basis to set the trial date as it currently is.

(Emphasis added).

The Court then telephoned a public defender to arrange for appellee to be interviewed. The assistant public defender who responded to the call advised the court of a letter, written by appellee's father, indicating that appellee did not want a public defender, and that the family would be raising money to retain other counsel.[13] Appellee's father stated that appellee would have an attorney by the time of his January 13 court date, at which time the court informed appellee's father that the State was moving to advance the trial date. Appellee's father reiterated that his son did not want a public defender: "[h]e doesn't want Public Defender (sic)." The court also noted that appellee's previous attorney had not yet entered his appearance in the case.

The assistant public defender expressed concern that they could be ready for trial by January 13, but agreed to interview appellee. The court acknowledged that appellant's father had been present at every hearing and was aware of the situation.[14] A status conference was set for the following week, November 27, 2002.

Appellee appeared at the next conference, again unrepresented. Upon questioning by the court, he admitted refusing

---

**13.** The court stated: "I have told [appellee's father] that there are some trial dates that have been set in this case and I can't wait forever and I can't wait for [appellee's father] to get enough funds to hire [private counsel]. This case has been kicking around for some time."

**14.** The court noted, "[h]e has been here every time ... I have had a [4-215 waiver of counsel] hearing. He knows what is going on. I have explained to him at least three or four times."

the services of a public defender.[15]  Notwithstanding appellee's lack of counsel, the court set the case in for a jury trial on December 11, 2002.

After the trial did not go forward on December 11, 2002,[16] appellee's previous counsel entered his appearance on behalf of appellee on December 13, 2002, and filed a motion to dismiss.[17]  The court reset the matter for a hearing on the motion to dismiss on December 20, 2002, and for a two-day jury trial on January 6, 2003.[18]  Appellee's motion to dismiss was granted at the conclusion of the December 20, 2002 hearing.  In granting the motion, the court stated:

> If the nol-pros is entered in an effort to avoid a ruling or order by the administrative judge enforcing . . . the 180–day

---

15.  The Court stated:

> [THE COURT]: [Appellee], I received a call from the Public Defender's Office indicating that you refused to talk to them.
> [DEFENDANT]: Yes, sir.
> [THE COURT]: Is that correct?
> [DEFENDANT]: Yes, sir.
> [THE COURT]: You do not want the Public Defender to represent you.
> [DEFENDANT]: No, sir.
> [THE COURT]: You will be representing yourself then, sir.  I have given you ample opportunity to hire counsel.  You have refused to talk to the Public Defender, and you have not hired private counsel, nor has your father hired private counsel.
> * * *
> [THE COURT]: You have been here at least 4 times.

16.  The court was closed due to inclement weather on that date.

17.  Appellee's motion was styled "Motion to Dismiss (State Seeks to Obtain a Strategic Advantage Through Inappropriate Use of a Nolle Prosequi)."

18.  At the December 13, 2002 hearing, the court also noted appellee's lack of representation at earlier stages of the case in reference to counsel for appellee's request to schedule the trial date in February:

> [DEFENSE COUNSEL]: Your Honor, if the Court would be inclined to give me [a trial date] in February, I would prefer February.
> THE COURT: I am going to give you—I have got to give you—this case has been kicking around.  Do you know how many 4–215s we have had with this gentleman?  He was told 12 times to get a lawyer.  He refused to talk to the Public Defender until the eleventh hour.

[*Hicks* ] rule—and that the nol-pros then enters to circumvent the order of the court, I don't believe that that can be done.

And ... while I honestly and sincerely applaud [the State's Attorney's] efforts to get this set back in within 180 days—and frankly, that may be a critical distinction.

But the position I have taken with respect to these motions and this rule is that there are two parts to that rule ... discussed in *Hicks*.

One is that trial has ... to be tried ... within 180 days. The other part to the rule ... is that it may not be continued unless for good cause shown by the administrative judge.

And the cases that have dealt with this issue on appeal have discussed the importance of allowing the administrative judge to manage this docket so that all cases can be handled in an efficient manner.

So ... it is not just the 180–day clause within the rule, but ... that the case cannot be continued unless for good cause shown and found by the administrative judge.

In this case, clearly the State entered the nol-pros to avoid the order of the administrative judge which is that the case not be continued, no good cause having been shown.

*I will say that the State, through the extraordinary efforts of [the State's Attorney], has managed in my view to satisfy the 180–day prong of that rule* by managing to get the case set back in on the re-indictment by December 11th, which makes this case different from any case that is cited on appeal.

That notwithstanding, I think when you read those cases, they stand for the proposition that ... notwithstanding that you were able to get it set back in, that still the net effect of this was that you overruled the determination of the administrative judge that there was no good cause for continuing the prosecution of this matter.

(Emphasis added).

The State filed a timely appeal.

## DISCUSSION

*Did the State's use of a nolle prosequi of the charges against appellee have the effect, either actual or intentional, of circumventing Rule 4–271, requiring appellee be tried within 180 days?*

The trial date for a criminal case in the circuit court may not be later than 180 days after the earlier of the appearance of counsel or, as provided in the Maryland Rules, the first appearance of the defendant before the circuit court. Maryland Rule 4–271 (implementing former Md. Ann.Code art. 27, § 591); Md.Code Ann.Crim. Pro. § 6–103 (2001).[19] The Court of Appeals in *Hicks, supra*, read former § 591 and Rule 4–271 to require all criminal cases in the circuit court to be tried within 180 days, and "where trial has not commenced within the prescribed period, the county administrative judge or his designee to find good cause for the postponement of the trial and the rescheduling of it beyond the 180–day period." *Jackson v. State*, 358 Md. 259, 262 n. 3, 747 A.2d 1199 (2000) (citing *Hicks, supra*).

In *Baker v. State*, 130 Md.App. 281, 745 A.2d 1142 (2000), we addressed the calculation of time under Maryland Rule 4–271 in cases where charges have been *nol prossed* and the defendant then re-indicted. Judge Moylan detailed the approach adopted by Maryland courts to calculate the 180–day period following a re-indictment:

When earlier charges are *nol prossed* and new charges are subsequently filed, the new charges have a life of their own. A new and independent 180–day count begins with respect to them. The *nol prossing* of initial charges, therefore, is not an occasion for skepticism or suspicion. Under the ...

---

19. Md.Code Ann., Crim. Pro. § 6–103(a) (2002) provides:

(1) The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:

(i) the appearance of counsel; or

(ii) the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.

(2) The trial date may not be later than 180 days after the earlier of those events.

approach[ ] chosen by Maryland, it is a legitimate and accepted way of doing prosecutorial business.

*Baker, supra,* 130 Md.App. at 288, 745 A.2d 1142.

■ However, the noted exception to this rule applies when it is demonstrated that the *nolle prosequi* had the purpose or necessary effect of circumventing the requirements of the 180–day rule set forth in Rule 4–271 and § 6–103 of the Criminal Procedure Article. In such instances, the 180–day period will begin to run from the arraignment or first appearance of counsel under the original indictment. *Baker, supra,* 130 Md.App. at 289, 745 A.2d 1142 (citing *Curley v. State,* 299 Md. 449, 462, 474 A.2d 502 (1984)).

The first prong of the test, that the *nolle prosequi* have the "necessary effect" of circumventing the 180–day rule, has been narrowly defined by the Court of Appeals. A *nolle prosequi* will only have the necessary effect of attempting to circumvent the 180–day rule when the only alternative to the *nolle prosequi* would be a dismissal with prejudice for violation of the *Hicks* rule. *Baker, supra,* 130 Md.App. at 292–93, 745 A.2d 1142 (quoting *Curley, supra,* 299 Md. at 462, 474 A.2d 502). Further, we have previously held that if time remains in the 180–day period when the *nolle prosequi* is entered, the *nolle prosequi* will fail "self-evidently . . . [to] have the **necessary** effect of circumventing the 180–day rule." *Baker, supra,* 130 Md.App. at 292, 745 A.2d 1142 (emphasis in original). The Court of Appeals has cautioned that not every effect of a *nolle prosequi* should be treated as a necessary effect. *Baker, supra,* 130 Md.App. at 297–98, 745 A.2d 1142 (citing *State v. Brown,* 341 Md. 609, 620, 672 A.2d 602 (1996)). Because there were more than fifty days remaining in the original *Hicks* calendar when the *nolle prosequi* was entered on October 22, 2002, the State's action, in and of itself, did not have the necessary effect of circumventing the 180–day rule.

The second prong of the test requires an inquiry as to whether the *nolle prosequi* did, in fact, have the purpose of circumventing the 180–day rule. Our decision in *Ross v. State,* 117 Md.App. 357, 700 A.2d 282 (1997), addressed this

aspect of a *Hicks* issue. In *Ross,* the trial date was scheduled well within the original 180–day period. On the day of trial, the State requested a continuance before the administrative judge because the drugs seized had not yet been analyzed. The administrative judge denied the requested continuance and stated: "I don't think this case can be put back in. Our docket is too crowded. It cannot be put back in before Hicks runs." *Id.* at 361, 700 A.2d 282.

After the administrative judge denied the State's request for a postponement, the State immediately *nol prossed* the charges and filed a new indictment. The defendant was tried within the "new" 180 day time, but beyond 180 days as calculated from the original indictment. In *Ross,* this Court held that the State's immediate *nolle prosequi* in the face of the denial of its postponement request circumvented the 180–day rule. *Id.* at 370–71, 700 A.2d 282.

The appellee argues that *Ross* is dispositive of the issue presented here. When asked why the case was not scheduled within 180 days of the original indictment, Akopian's counsel answered:

Now, what happened is they re-indict him ... that Friday. They then get an arraignment that next Tuesday. They get a trial date of January, which would have been outside of *Hicks.* Then the state obtains a status for the following Friday and tries to advance the court date to get it within the 180 days of the first case.... The bottom line is it didn't happen ... for a couple of reasons. No. 1, the court just can't do it. The January court date was given. There was a court date that was given that would have potentially been within *Hicks* ...

That response does not present all the facts apparent from the record. In fact, as we have noted in detail, the State made numerous attempts to expedite the trial date to avoid a *Hicks* problem, and to inform the attorney who represented appellee in the first case of its efforts, even though his appearance was not formally entered. *Ross, Curley, Baker,* and *Brown* are factually inapposite as they relate to the efforts by the State

to avoid a *Hicks* dismissal. In those cases the State was attempting to save a case from dismissal for its failure to bring the defendant to trial within 180 days. Here, by contrast, the State was vigorous in its effort to advance the trial date to fit within the original 180 day calendar.

At this point it is appropriate to review our recent decision in *State v. Price,* 152 Md.App. 640, 833 A.2d 614 (2003), *cert. granted* 379 Md. 98, 839 A.2d 741 (Jan. 9, 2004) (No. 107). There, we discussed the consequences of the entry of a *nolle prosequi,* followed by a re-indictment and a trial on a date beyond the expiration of the *Hicks* time. So that our position is clear, we shall point to the distinctions between *Price* and the instant case.

In *Price,* the State had entered a *nolle prosequi* after the administrative judge had denied its motion for continuance, the ground for which was the unavailability of DNA evidence, which had not been processed by the crime laboratory in time for trial. The State was faced with a discovery order to produce the report within the time ordered by the court, and the potential for dismissal based upon a discovery failure. The *nolle prosequi* was then entered and a re-indictment followed.

Speaking for this Court, Judge Davis wrote:

The "necessary effect of the nol pros" was to circumvent not only the requirements of [Art. 27] § 591 and Md. Rule [4–271(a)(1) ], but also the sanction that "the State be prohibited from introducing any witness or evidence at trial or hearing which relates in any way to the nondisclosure for failure to comply" with the motion to compel discovery.

152 Md.App. at 655, 833 A.2d 614.

In that case the State's entry of the *nolle prosequi* was to avoid the sanction for its inability to comply with the discovery order, which resulted ultimately in a trial date beyond that permitted under the *Hicks* analysis. We held, therefore, that the *Hicks* period began from the date of the initial indictment, not from the date of the re-filed indictment, and that the court did not err in dismissing the case. Here, we have no such lack

of diligence, for the State stood ready to try the case well before the expiration of the 180 day period.

A second distinction between the facts of the case *sub judice* and others cited is that, unlike the others, appellee continued to appear without counsel and continually refused the services of the public defender, despite the efforts of the administrative judge to counsel him on the importance of being represented. Having exhausted its efforts to have appellee obtain counsel, the court finally set the case for trial.

Appellee's refusal to obtain counsel cannot be discounted in assessing the time taken to get the case to trial, from the State's initial postponement request on October 22, 2002, until the actual trial date set for December 11, 2002, when, but for the unforeseen closing of the circuit court because of inclement weather, the case presumably would have gone to trial. Further, the case before us is unlike *Curley, supra,* 299 Md. at 462, 474 A.2d 502, where the State *nol prossed* the case on the 180th day. As we have previously held, a *nolle prosequi* is a procedural device that may be used by the State at its discretion, and not the discretion of the trial judge. *Baker, supra,* 130 Md.App. at 294–96, 745 A.2d 1142.

We cannot discern from the record facts that would indicate that the State's use of a *nolle prosequi* had either the necessary effect or the purpose of circumventing the 180–day rule, as more than fifty days remained in the *Hicks* period. When the case was originally called for trial on October 22, 2002, the State's witnesses were unavailable due to the exigent circumstances of the serial sniper shootings in Montgomery County. In denying the State's motion for continuance, the administrative judge indicated his expectation that the trial proceedings would be somewhat delayed by selecting a jury, and that the State would not reach the then-absent witnesses until at least the second day. We agree with the State that, "[i]t was under these specific circumstances that the administrative judge denied the State's request for postponement, in the anticipation that trial would not begin until, at the earliest, the next day."

The State was willing to commence the trial on October 22, by litigating pending motions and, thereafter, participating in jury selection. Appellee's unexpected waiver of his right to trial by jury, and election of a bench trial, effectively pulled the rug out from under the State. Faced with the unavailability of necessary police witnesses, and rather than go forward and not be able to prove its case, the State chose to *nolle prosequi* and re-indict. We recognize that a defendant's election to be tried by a jury or by the court is absolute. Likewise absolute is the State's option to utilize the *nolle prosequi* as a tool to avoid unfairness to the prosecution.

Therefore, we hold that the entry of the *nolle prosequi* on October 22, 2002, had neither the necessary nor intended effect of circumventing the 180–day rule. A new 180–day time period began after appellee's re-indictment, accounting from the date of his initial appearance after that indictment. It is abundantly clear from the record that the State made extraordinary effort to obtain a trial date well within the outside limit of the original 180–day calendar. In every instance the State's effort was thwarted by appellee's appearance without counsel and, what we conclude to be, his refusal to be represented.[20] It is true that the savvy defendant can manipulate the system to obtain delays, and the facts before us lead to the inescapable conclusion that appellee's goal was to delay trial to the point of a *Hicks* violation, despite the State's best efforts to avoid that result. The State should not suffer the detriment of his manipulation.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS ASSESSED TO APPELLEE.**

---

**20.** To be sure, this is not a Rule 4–215 case where we are asked to determine whether a defendant waived the right to counsel by inaction. Were it such a case, however, we would have no difficulty in finding that appellee's actions, or inaction, amounted to a waiver of his right to counsel.